## No. 6402.

NICHOLAS J. HOEY, LIQUIDATOR &c., vs. SAMUEL HENDERSON AND OTHERS, LIQUIDATING COMMISSIONERS &c.

No fundamental change in the charter of a corporation, which vitally and radically affects fixed and established rights, can be forced by the acts of the majority upon an unwilling stockholder.

APPEAL from the Fifth District Court, parish of Orleans. *Cullom, J.*

C. E. Schmidt for Plaintiff and Appellee.

G. Fernandez and E. B. Kruttschnitt for Defendants and Appellants.

The opinion of the Court was delivered by

LEVY, J. The plaintiff, liquidator of the late firm of C. E. Girardey & Co., brought suit against the defendants, liquidating commissioners of the New Orleans Insurance Association, in which he prayed for judgment against the said commissioners, *individually in solido*, and also in their capacity aforesaid, for the sum of fifteen hundred dollars with interest from judicial demand, which sum he claimed as the amount due the late firm of C. E. Girardey & Co. for its share of the profits realized by the late New Orleans Insurance Association from the time it went into operation up to the date of its dissolution, this in the event of said commissioners refusing or neglecting to comply with plaintiff's demand in his petition, that they should file a full and final account, as liquidators, showing how they have settled the affairs of the Association and the net amount of profit to be distributed among the stockholders, and that they should be ordered to pay over to plaintiff the amount found due to his late firm upon the rendition of the account, plaintiff alleging that said firm was a stockholder in said Association to the extent of twenty shares, at one hundred dollars per share. As the grounds on

69

which his action is based, plaintiff in his petition alleges, further, that the charter fixed the capital stock of the Association at $500,000 (with the right to increase it to $1,000,000), this stock being divided into shares of $100 each, to be paid as follows, viz : By the subscribers furnishing their notes for the amount of their shares, payable on the 31st of December, 1871, said notes, however, to be reduced by a credit thereon of the net profits made by the Association in the first and second years, and in case said net profits should not have extinguished the notes at maturity, the stockholders were then to pay the balance due thereon. That the Association was organized on the 7th of August, 1869, and shortly thereafter commenced business, and in the beginning of January, 1871, presented its first annual statement of business done up to the 31st of December, 1870, whereby its net profits were shown to be $293,324 86, and its assets, independent of the stock notes of the stockholders or subscribers, were stated to be $433,779 86 ; that at the same time the Board of Directors adopted and published a resolution declaring their intention to pay to the shareholders a dividend of fifty per cent cash, payable from the 15th of February, 1871, by a credit on the stock notes *pro rata* of the amount of premiums paid by each stockholder. That an amendment to the charter to the above effect was proposed, and this even being insufficient and inadequate to authorize this mode of distribution, a vote of the shareholders was had, whereby the Association was dissolved, liquidating commissioners were appointed and a new association organized. That Samuel Henderson, Jules Aldigé and D. Bouligny were appointed commissioners to liquidate and settle the affairs of the late association. Plaintiff further represents, that, in the year 1872, the stock note given by the said late firm was returned to them; that subsequently, viz.: in September, 1873, a demand was made by the firm on the commissioners for an account of their liquidation, and sometime thereafter the firm was informed by the commissioners that they considered the firm as having waived and abandoned its rights as a shareholder and all claims to any part of the profits or assets of the corporation. Plaintiff avers that no such abandonment and waiver has been made, but, on the contrary, that said firm is entitled to all the benefits resulting from its subscription. Defendants filed an exception, to the effect that the plaintiff, as liquidator of the firm of C. E. Girardey & Co., had not the right nor authority to institute the action or the capacity to stand in judgment therein. On the trial of this exception, evidence was introduced to show the authority and capacity of the plaintiff as liquidator, and the exception was overruled. There was no error in this ruling.

For answer to plaintiff's petition, defendants, after denying, generally, the allegations thereof, averred that on or about the 22d of March,

1872, the firm of C. E. Girardey & Co. canceled their original subscription to the capital stock of the late New Orleans Insurance Association, accepted in return the original stock note subscribed by them and recieved settlement in full of all claims, interest and benefits which had accrued to them by reason of their said subscription; that by the said cancellation of their original subscription and the reception of their said stock note, as well as by the provisions of the charter, the said firm abandoned, forfeited and lost any and all rights in and to the capital stock of said New Orleans Association, together with any and all interests and benefits therein, and ceased to be stockholders.

The sole question, then, raised by the pleadings, and submitted for decision, is that of abandonment and forfeiture of the rights and interest of the said firm in the assets and profits of the Association.

The evidence in the record discloses that on the 23d of March, 1872, a date subsequent to the dissolution of the old Association, a receipt was given by J. H. O'Connor, who was then the book-keeper and cashier of the firm, as follows :

"Rec'd, New Orleans, March 23d, 1872, one stock note for 20 shares, canceled by mutual consent, and also $25.75 for rebate of 15 per cent. on $165.

    (Signed)                      C. E. GIRARDEY & Co.,

                                  Per J. H. O'CONNOR."

It is contended that this receipt operated as a cancellation of the firm's subscription to the capital stock, and thereby ceasing to be a stockholder, it was not entitled to share in the profits of the Association, but abandoned and forfeited such right, and in the instance recited in the receipt, accepted the rebate of fifteen per cent on certain premiums paid, which rebate was paid in lieu of any right or interest, or claim in the accrued profits to which, as a stockholder, it would have been entitled. It appears that the old Association, by the vote required under its charter, had, on the 12th of April, 1871, been dissolved, and a new corporation was established, into which the stockholders of the old had a right to enter, and into which many of them did enter. The right of dissolution under the terms and stipulations of the charter was clear and indisputable; but we cannot recognize the right to transfer its shareholders without their assent to the new corporation. The capital stock of the old Association was represented by the notes of the stockholders in the amount of their several subscriptions, which notes were made payable on the 31st of December, 1871, and it was provided in the charter that " the notes furnished as above provided for, shall be reduced by a credit thereon of the net profits made by the Association in the first and second year ;" also, " at the maturity of said notes, if the net profits of the Association for the first and second years have not ex-

tinguished the said notes, the stockholders shall pay the balance due thereon." In Article V of the charter, we find the following: "Any losses, or balance due, or losses sustained by the Association at the beginning of its operations, and when the Association shall not have sufficient funds to cover the same, shall be paid *pro rata* by the stockholders." At a meeting of the stockholders, held in November, 1870, an amendment to Sec. 2. of Art. IV of the Charter was adopted by a vote of upwards of two-thirds of the stock represented in the meeting, as follows: "The notes furnished, as above provided for, shall be reduced by a credit thereon of the net profits made by the association in the first and second year *pro rata to the amount of earned premiums that shall have been paid during that time by each stockholder.*" On January 2nd, 1871, in accordance with this amendment, the Board of Directors resolved to "declare a dividend of fifty per cent. cash, payable on or after the 15th of February next, by credits on stock notes pro rata to the amount of earned premiums paid by each stockholder." On the 7th of February, 1871, before the day fixed for payment of the aforesaid dividend, a document was signed by 642 stockolders, representing 9001 shares of stock, wherein it is set forth: "That a number of stockholders, who have not effected insurances and paid premiums, in utter disregard of the spirit which presided at the creation of the corporation, but which, accidentally, is not fully expressed in the charter, insist upon an undue participation in the profits realized by the corporation on an equal footing with those stockholders who have effected insurances and paid premiums, and that such unjust pretensions are ominous of dreadful complications and of incalculable injuries to the parties concerned, do now appoint Mr. Chas. Cavaroc, giving him authority to vote, at any called meeting, or otherwise, for them and in their name, for the immediate dissolution of the Association and the liquidation of its affairs, and to authorize the present Board of Directors to take the steps necessary to that end, under the provisions of Article XI of the charter, and on such basis as they may deem advisable in the common interest to adopt, the said Board to continue in existence until the final winding up of said liquidation."

On the 12th of April, 1871, a general meeting was held, at which, by a vote representing 9001 shares of the capital stock, out of 10,000 (the whole number of shares), the dissolution and immediate liquidation of the affairs of the Association were ordered. On the 14th of April, 1871, Messrs. Samuel Henderson, Jules Aldigé and D. Bouligny were duly appointed Liquidating Commissioners.

The first point for our consideration is: Had the majority of two-thirds of the stockholders the right to alter the original charter of the association, as affected by the amendment above recited, whereby the

rights of the stockholders could, without their consent, be impaired or altered to their prejudice ; or does such amendment and alteration fundamentally change a contract, under which stockholders had acquired fixed rights, of which they could not be deprived without their consent, given at the time or by subsequent ratification ?

We think the amendment was a fundamental change of the original charter, and could have no effect as to the rights of the stockholders who did not give their assent to such change. The firm of Girardey & Co. did not assent thereto. The terms and conditions under which it subscribed to the stock and became members of the corporation, and by which it became liable for the amount of its subscription, and entitled to a participation in the profits, are clearly set forth in article 4 of the charter, and constituted a contract. The proposed change virtually and radically affects fixed and established rights, and could not be forced upon an unwilling stockholder. This principle is declared in 3 Caldwell (Tenn.) R. 488, where the court held : "A charter of a corporation is, after acceptance by the persons incorporated, an inviolable contract between the corporation, as it is also between the corporation and stockholders. Neither can disregard its obligations, or alter its essential franchises, without the unanimous consent of the stockholders ;" and "if the alterations proposed in the charter of a private corporation by legislative enactment are merely auxiliary and not fundamental, they may be accepted by a majority of the corporators ; and when so assented to, they are binding on the whole ; but it is otherwise when the alterations are fundamental, radical, and vital, the acceptance must then be unanimous."

In 2 Metcalf (Ky.) R. 314 : "An amendment which materially and fundamentally changes the responsibilities and duties of the company, or which superadds an entirely new enterprise to that which was originally contemplated, may be resisted by the stockholders, unless such amendments are provided for in the charter itself, or in the general laws of the State in force at the time the act of incorporation was passed." See, also, 11 Ga. 438 ; 11 Mich. 155 ; 8 Mass. 268 ; 9 Ill. 177.

In this case the plaintiff's firm entered into a contract, whereby he furnished his note, rendered himself liable therefor, and this with the express agreement on the part of all the corporators, that the net profits profits of the corporation, made during the first and second years, of its operations, should be in a certain and clearly defined manner apportioned between them, by application thereof to the notes furnished by the stockholder corporators. The proposed change, whereby these profits were to be divided pro rata among the stockholders, as to the amounts of earned premiums paid by them respectively, was a material, essential, and fundamental alteration and change, violative of the contract between all the members of the corporation.

The subsequent dissolution of the corporation was regularly effected in accordance with the mode prescribed in the charter itself. The net profits of the association, accruing from its organization up to the date of its dissolution, became then distributable among the stockholders. Those who did not assent to the transfer of the assets to the new association became entitled to receive their proportion of such profits, and the dissolution taking place before the maturity of their notes, and no further liability existing thereon, as shown by the statement of its affairs, they were entitled to the cancellation and return of their notes.

But it is contended by the defendants that the firm of Girardey & Co. canceled its original subscription to the capital stock of the late New Orleans Association ; accepted in return their stock note, and received settlement in full of all claims, interest and benefits, which had accrued to them, and thereby abandoned, forfeited and lost all rights, interest and benefit to which they may have been entitled.

It appears from the evidence, that J. H. O'Connor, the book-keeper and cashier of Girardey & Co., on the 23rd of March, 1872, called at the office of the Insurance Association, on business other than that connected with the stock note, or referring to the matters involved in this litigation. The subject of the cancellation of the stock note was brought forward by the Secretary of the Association, who asked O'Connor what the firm of Girardey & Co. would do about their subscription, and if they were going to cancel it? O'Connor replied that he thought it better to cancel it. Whereupon the following receipt was given :

"Received, New Orleans, March 23d, 1872, one stock note for twenty shares, canceled by mutual consent, and also $25.75 for rebate of fifteen per cent on $165.

(Signed):                                    C. E. GIRARDEY & Co.,

Per J. H. O'Connor."

On this receipt defendants rely in support of their defense of abandonment and forfeiture by the firm of Girardey & Co.

There is no proof of any special authority in O'Connor to enter into any such agreement as is claimed, and we do not think he was competent to bind the firm without such power or authority. The mere receipt of the note and its cancellation were rights to which that firm was entitled, and the receipt of the $25.75, for rebate of fifteen per cent on premiums paid by it, cannot be regarded by us under the facts and circumstances of the case, as being accepted by O'Connor in satisfaction or full settlement of Girardey & Co's claims as stockholders of the old Association. Their rights were fixed and known to the Association, if not fully known as to the amount by Girardey & Co., and we cannot, under the evidence of O'Connor, construe the receipt of this comparatively insignificant amount as being intended by O'Connor, even if he had

authority to act in the premises, as a settlement of the whole claim. O'Connor, in his testimony, says : "I receipted for the note simply, but really I don't think I was very much inclined to give any opinion as to its merits. I was not acquainted with them, and therefore I am not very apt to have given any opinion. I got this money and the note, and I took it to the office of C. E. Girardey & Co., and mentioned the circumstance to Mr. Girardey, and I remember his expressing dissatisfaction at the arrangement; he said he would not comply with it, and sent me to inform Mr. Lanaux of that fact. I went to Mr. Lanaux, and he referred me to Mr. Cavaroc, the President of both the original and new companies, to whom witness related the dissatisfaction with the arrangement; Mr. Cavaroc said he would inquire into it. I certainly didn't suppose that by a mere receipt for the note, it canceled any of the rights of C. E. Girardey & Co. I am satisfied Mr. Girardey didn't think so." Mr. Hoey testifies (and he was a member of the firm), that, "no member of his firm ever, to his knowledge, consented to the annulment of the subscription," and that when the receipt was shown to him at the company's office, he objected to the authority of Mr. O'Connor to sign it. Thus we think there is no proof of the ratification, either express, implied, or by silence and inaction, of the act of O'Connor, but on the contrary, it seems to us there was a prompt disavowal and effective denial of any authority in O'Connor to bind the firm in the matter of the alleged cancellation of the subscription and abandonment of the rights of the firm. Under the views which we have expressed, we think the plaintiff is entitled to recover. The judgment appealed from is therefore affirmed with costs.

The Chief Justice recuses himself in this case, having been consulted at the time as counsel in the subject-matter involved.